Laura M. Barraford, etc. et al. v. T&N Limited, etc. et al. Mr. Levin. Good morning, Your Honor. Richard Levin for the Mrs. Barraford and the Federal Mogul Asbestos Personal Injury Trust, which is her agent. Your Honors, why are we bringing this case and why is this case important? It is beyond just Mrs. Barraford and her claim against T&N, the defendant, Pelley here, but it will govern the fate of numerous cases like it, which the T&N Chapter 11 plan set up to allow the trust to pursue on behalf of these claimants. We submitted last week the decision in the Rhode Island case that that was a state court, but there's 15 cases pending in the New Jersey Federal District Court, and there are others, perhaps others to come following that, depending on the outcome of this case. So that is, I would like to set the context here before we get into the specifics of Mrs. Barraford's case. Mr. Levin, just for my own edification, in the 30-day period after the discharge, were any cases brought by the trust? No, Your Honor, none. The trust had barely formed. And does the record, your opening remarks, does the record provide any quantification of the number of claims that are at stake here? Not directly, Your Honor. The record shows that there were 114,000 personal injury claims pending against T&N at the time it filed its bankruptcy petition. One can assume that between 2001 and 2007, more manifested, more injuries manifested, but we don't know how many there were. We do know that there are, and this is not in the record, so with appropriate caution, the trust has received over a million claims by victims, asbestos victims, through the normal trust claim processing procedures. If I understand it correctly, and correct me if I'm wrong, if a claim is brought now, if somebody just discovers that they have contracted the disease, their statute of limitations begins to run now. Correct. And so they would have a claim ultimately under this arrangement. Their claim would not be affected by this case. Correct. I forgot to request at the beginning, I'd like to reserve three minutes, if I may, for rebuttal.  Thank you. T&N proposed its plan in the Chapter 11 case to accomplish three objectives. It wanted to emerge from bankruptcy without awaiting a full resolution of all the claims. Pretty standard. It wanted to preserve the Hercules policy for the Asbestos Personal Injury Trust. That's clear from the record. And third, it wanted to channel all of the asbestos claims to the trust, which is also how asbestos cases have been conducted since Manville, every one of them. I ought to make a remark about the channeling injunction, because I think there's a misperception in Apelli's brief on this, and that is a channeling injunction does not substitute for the automatic stay. The automatic stay protects only the debtor. The channeling injunction protects many third parties, not the debtor, so that they won't be sued for whatever conduct they had in connection with the asbestos injuries. Mr. Levin, if I'm understanding your argument right, don't you need to convince us that the plan did at least two things? It continued to stay, in effect, for claims, asbestos claims, but it also allowed the trust, notwithstanding the stay, to bring claims in ordinary course. Yes. And so what language in the trust accomplishes both of those things? It's not in the trust. I'm talking about the plan. The language that accomplishes the first is indirect. It is that the claims, the asbestos personal injury claims, were not discharged upon the effective date of the plan. The plan is very clear in 4.5.6 and 4.5.20 that the discharge does not incur until much later. And the bankruptcy code says that the automatic stay terminates upon discharge. Now, I realize, as I was preparing for this, there's a missing concept there, but it's clear from the statute. We haven't expressed it well in our briefs, and that is the 1141, which grants the discharge, 1141D1, does not discharge the debtor. Actually, what it says is discharge the debtor from debts. So you have to read that into 362, the discharge from debts. The debts that were discharged were the non-asbestos personal injury debts. The asbestos claims were not discharged, and if they were not discharged, the stay does not terminate. Now, before I get to the second point, Your Honor, if I may continue on this one for a moment, the defendant, TNN, who proposed this plan, says the claims were, there's only one discharge, or that this discharge was granted but deferred. But the language of the plan is very clear that that's not the case. And the Supreme Court in Travelers' Indemnity against Bailey, which we cited in our paper, says once there's a final order on the plan, it's no longer subject to collateral attack. You can't say the bankruptcy code didn't authorize it, or it should be changed in some fashion. So that's the first point. Yes, Your Honor. Mr. Levin, one of the things that troubles me is this was obviously a very heavily negotiated deal. It was different than all of the other because of this very unusual policy, which was not transferable. So I would have thought that in drafting this agreement, that the drafters on your side would have said, we have a problem. We have all these claims, which we already know exist, where the statute has run, but it's only kept alive because of the automatic stay. We have to directly account for those in the drafting of the agreement. And as I look at the agreement, and just hearing you now, I wonder whether that was just something which was missed. Well, Your Honor, I think I'd answer it this way. First of all, it was the drafters on the defendant's side. It was TNN's plan. But as we point out, and as you note, this was an unusual case. And when you have something that's new and untested, the parties try to think through all of the implications, and they do the best they can. And as the Ninth Circuit said in the Hillis case, we don't require perfection in the language as long as the intent is clear from what's in the plan. And that's this case. It's unambiguous that the discharge was deferred, and there are implications from that that go down the road, as I was just saying. And, sure, hindsight is 20-20. Now that this issue has arisen, and by the way, it arose only after two years of litigating the Bareford case. That case sat for two years before somebody said, oh, wait a minute, there's a statute of limitations problem here. So hindsight is 20-20, but the implications of the plan are sufficiently clear to get there. Could you answer the second question? Yes. The second question was that there have to be sufficient modification of the stay to permit the actions to proceed. The plan in 4.5.8 specifically authorizes the trust to bring these claims on behalf of the asbestos claimants. There's nothing in the bankruptcy code that says when a court modifies the stay, it has to use certain words to do so. And by authorizing this, it has effectively modified the stay. 362D provides for one means of modifying the stay. The statute doesn't say it's the exclusive means, but even if it were, it requires request of a party in interest, notice in a hearing, I'm sorry, notice to parties, to creditors and a hearing, and all those three things were done with respect to the plan in this case. Now, why didn't the modification then terminate the stay? If you look at 362D, 362D authorizes a bankruptcy court to grant relief from the stay such as by, quote, limiting, annulling, modifying, or conditioning the stay. Congress sought four, at least four ways of modifying the stay. But when it went to 108C, C2, and said when does the statute of limitations start to run again, when does the tolling end and the 30-day grace period start, it used only termination, not modification. Congress is presumed to use the words in the same meaning in the same statute, and when they don't use modification, is there a reason Congress would do differently? And I think, you know, we can all guess what Congress's motives were, but I think it suggests itself that where a court modifies the stay, the court retains some power over the stay. The creditor is not released from the bankruptcy and set free, but rather the court retains something, and therefore the statute of limitations doesn't start running again. But when it's terminated, the creditor now can go about his business free from any restrictions in the bankruptcy court. What, though, are the limits on the ability to bring a timely claim under your theory? It can't be open forever. Well, it can be. It can be, and I'll tell you why. A defendant can waive the statute of limitations. A defendant can totally waive it for all time or for a specified period. TNN, the defendant here, proposed the bankruptcy plan, and the waiver here is up until the Hercules policy expiry date. So it is not troublesome that there is a long extension of the statute of limitations because the defendant was the one who proposed it. Well, 4.58F2, which you point as modifying the stay. Yes. It modifies it for the purpose of allowing suits to proceed in ordinary course. Yes. Doesn't that imply that you couldn't just warehouse them for 20 years? Well, I don't think it's a question of warehousing them. Obviously, the trust has an interest in bringing them as soon as possible. Litigation by the TNN through its reinsurers has delayed and slowed the process. It's made it more difficult to bring those claims. This case, obviously, is going to dictate a lot of what claims are brought and what are not. But the trust has begun bringing claims, but it's a complicated process. So I don't think it's a question of warehousing them. What about the doctrine of laches, which is ordinarily available? You know, we cited laches in our brief, and I have to admit error there. Laches applies on an equitable claim, not where there is a legal statute of limitations. But here that statute has been waived through the mechanisms of the plan that TNN proposed. If there are other questions, otherwise I'll reserve. Thank you, Your Honor. Mr. Perry. Chief Judge Lynch, may it please the Court. You heard my friend, Mr. Levin, just tell you that the trust is seeking perpetual litigation. This litigation will never end. In the seven years since the effective date, the trust has only brought 22 suits. It claims lawsuits in court. It claims to want to bring thousands more in its brief. There's no evidence of that. This is a summary judgment case. But their position is they can leave all those cases up on the shelf and take them down whenever they want and file them in the court system, even though the witnesses have died or all the problems with statute of limitations. That's not the bargain that was made. The bargain that was made, the plan is working exactly as it was designed. The individual claimants, the Mrs. Barifords of the world, do not sue my clients under this plan. They have claims directly against the trust. And the TDPs, the trust distribution procedures that were approved as part of the plan, have a schedule of payments for those plaintiffs. So they are taken care of regardless of the tort system. Then there is a separate bargain, which is that the trust may, but need not, choose to bring individual tort lawsuits against the reorganized debtors. Those lawsuits must proceed in the ordinary course, that's 4.5.8, and the defendants may assert, quote, any defenses, that's 4.5.8c, so that in two separate provisions the plan preserved the ordinary workings of the tort system. Judge Stahl, you asked an important question about whether the party simply missed the statute of limitations. The TDPs, which are attached to the plan, negotiated by the plan proponents representing asbestos claimants for the purpose of operating the trust and approved by the bankruptcy court, deal with the statute of limitations. This was on everybody's mind. And the trust elected to toll the statute of limitations as to claims against the trust. That's Section 5.1A2 of the TDPs. So we know they were thinking about it. The plan itself, however, is silent on limitations provisions. But when they have to toll against the trust, because there's nothing in the code that would have done it without that. That's not quite right, Your Honor, as to these claims. And remember, the only question in this case are claims, individual claims, as to which the state statute of limitations expired before the effective date. Mr. Levin just acknowledged that all the later accruing claims are not at issue in this case. So it's only those claims. They had an inventory of those claims. They had the Asbestos Creditors Committee and the Future Claimants Committee, very good lawyers, lots of lawyers here in this room representing asbestos claimants. They had an inventory of those claims. They knew what they were. They could have dealt with them in any number of ways. What they chose to do was to allow them to go into the trust, as I just stated. As to the tort claims, they could not do that. They could not toll the statute of limitations, both because the bankruptcy code doesn't permit it and because the defendants didn't agree to it. What the defendants agreed to, the bargain that was struck, was simply take the tort system lock, stock, and barrel, that if the trust chooses to assert a claim, it goes through. We have a perfect case study, Your Honor. In Massachusetts, the trust has filed exactly two cases in the seven years since it's been in existence. One, the Bareford case, it filed too late, and therefore it was summary judgment against the trust. The other, the Leiden case, it filed on time. It filed it within three years. It proceeded to trial in front of a jury. It, in fact, got a verdict for the trust. It's how we would expect the tort system to work. In fact, those other 22 claims and cases that I've described, some were settled, some were dismissed, some have been tried to judgment, some are still pending. They're ordinary tort cases. So it's your position that what they could have done in this negotiation was to take those claims that they already knew existed and said, as to these claims, we have X amount of time to bring them. And that wasn't done. Is that your position? Well, Congress already done that. The background rules, the default rules, the off-the-rack rules are set by the code. 30 days after history. But in making this deal, it's your position, I think, if I understand what you just said, that you could take these claims where they knew they had expired statute of limitations and said, as to this schedule, we have X amount of time to bring claims. They could have asked for that in the negotiation. They did not. You might not have agreed to it. We wouldn't have agreed to it, and they didn't even ask for it. That's on the record. Why in the world wouldn't they? It seems to me your premise is that they were asleep at the switch and just let a whole bunch of claims disappear for no reason at all. It's not for no reason at all, Your Honor. The Hercules policy was mentioned, which has a number of limitations and provisions that will terminate the coverage. Had they insisted on a waiver of the statute of limitations, it would have terminated the coverage under the Hercules policy. So the reason they didn't ask for it is not that they were asleep at the switch, it's that they were trying to preserve this policy. No, but they could have written into the plan that the stay will continue until X date. Absolutely, Your Honor. So why didn't they do that? Your Honor, they chose, all of the proponents of the bankruptcy, including the asbestos claimants, chose to get this deal done when it was done. But it seems to me your premise is that they goofed big time. Oh, I don't agree with that, Your Honor. They had the 30-day clock of Congress. They decided to go with that. They accepted the off-the-rack rule for the warehouse claims, for the past accruing. But if that were correct, then they would have filed a bunch of suits within the 30 days. One would think so, Your Honor. Exactly. So, again, I return to the point. Your premise is that either they were completely asleep at the switch when they negotiated the plan, or they went into a 30-day nap afterwards. Or they chose not to assert the claims, and now they're trying to claw back the results of that conscious decision made by a series of expert professionals. I mean, this is a trust, Your Honor, funded with $775 million, an army of lawyers from the Cravath Law Firm and the Motley Rice Law Firm and many others. They know what they're doing. And they could have hit that 30-day window if they wanted to, and they chose not to. And what was their motive for deciding to throw these claims, cast them aside? I think that's a question you'd have to ask Mr. Levin, Your Honor. But can you speculate on the record? I mean, we assume that people, when they negotiate an agreement, when we look at anything that might be ambiguous, we assume people had some reason. What reason could they have had for just casting out all these claims? There's nothing in the record. My assumption, Your Honor, is they were focused on future claims, the future accruing claims that Judge Stahl mentioned earlier. Mr. Levin said in the Rhode Island argument that most of the claims they were concerned with, that the trust was concerned with, are those arising in the future, and that, therefore, those claims, as they accrue, they could bring in the tort system. They chose, however, as to the past expired claims, they took the off the record. And that's what we have. You said they had an inventory of such claims, and you are implying that they could have moved within 30 days to have brought those claims. I don't know what your brother will say about point one, but point two, they have made the argument to us they didn't even exist until the beginning of that 30-day period, and it was physically impossible for them to hire personnel. They didn't actually manage to set up a claims procedure for months after that, and that the agreement must be understood to have been a mechanism to allow these people who had been affected by the stay in bankruptcy to eventually bring their claims. I can only answer that with respect to Mrs. Barefoot's claim, Your Honor. She had actual notice in 2002. She filed suit against all the other asbestos companies in 2004. The trust is suing as her agent. The trust is charged with all of her knowledge. The trust didn't exist until the beginning of the 30-day claim period. That's not accurate, Your Honor. Okay, what's not accurate? If the court were to review the disclosure statement and the plan, the stack of documents deals with all of this, everything about this was pre-negotiated before the effective date. All of the trust documents, the trust assets, the trust funding, the trust advisory committee, the trustees, everything had to be ready to go before confirmation so that they are technically right in the sense that the first operating day was the effective date, but there was nothing left to chance. It's not like they had to run around and do a bunch of things after that. Everything was pre-arranged, including all the legal framework and the claims. And if the trust had needed more time to do any of those things, the time to negotiate that was before the plan was entered because it was specifically negotiated that the plan could not be confirmed until, for example, the trustees were appointed and the trust documents were in place. If they needed also more time for trust claims, that was the time to do it. So this is all just a defense to a malpractice action against somebody? I'll let Mr. Levin answer that one as well. May I make one more point, though, about your question about why they didn't bring Mrs. Bariford's claim within 30 days? Yes. Because we only have one case in front of us. They brought an equitable estoppel argument, an equitable tolling argument in the district court. The plaintiff in equitable tolling arguments, the court knows, has the burden of coming forward with proof as to what extraordinary circumstances prevented her from bringing suit within the statute of limitations. They brought none. As Judge Saylor points out at the end of his opinion, this is a summary judgment case. The trust chose to put on no evidence that it was impossible to bring this case. Whether or not it was impossible to bring any other case, there is nothing in the record. And, again, this is a summary judgment case and they have the burden of proof. But as to this case, they brought a claim in the district court, a claim for equitable tolling, that required them to put on that proof as to Mrs. Bariford, and they totally failed. They did not put in one scintilla of evidence that it was impossible, impractical, unlikely, uncertain, or anything else. All of these things about the trust's existence and documents and so forth, Mr. Levin has made up for this appeal. None of that was presented to Judge Saylor, and they had the opportunity and the obligation to do it. So as to Mrs. Bariford's claim, we know the answer. They have no excuse. They have no reason. They simply missed the deadline. Let me see if I'm understanding that, because doesn't it logically follow that it may well have been possible within 30 days to bring virtually any one of these claims that had been identified as preexisting, and yet it would also follow that it was impossible to bring a large number of them? I don't know if that follows, Your Honor. Again, the trust, when it came into existence, had $775 million in assets and an army of lawyers. They put in no evidence as to how their claims processing abilities, but it's also a problem of their own making. The way this was structured was the trust assumed all the liabilities to the individual claimants. They agreed to pay out these claims, and then the bargain was that the trust could then go to the tort system. If it was not possible to do it, it's too late now for them to be making that argument. That was an argument they had to make to the bankruptcy court in the structure. And again, the negotiations and details here, you know, Article 4 itself is hundreds of words long. The entire documents are thousands and thousands of pages long. No part of this plan was not thought of. There were reasons and compromises. This is a contract. It's a bargain, and it's a bargain that can't be remade after the fact. And the bargain as to the expired claims as imposed by Congress and not modified by the code or by the plan or by the confirmation order is that those claims had to be brought within 30 days. And that shouldn't surprise. The bankruptcy code has all kinds of limitations provisions like that. The Supreme Court in the Freeman v. Taylor and Cron's case specifically addressed a 30-day limitations provision and said that is acceptable and it can't be modified by the parties. We submit that this is the same kind of way. And so all of these arguments both are irrelevant to Mrs. Barefoot's case because of the lack of evidence, but also as to things. Now, to make the plan work the way they now want it to work, Mr. Levin has invented this phantom provision that both extends the automatic stay past the discharge date and modifies the automatic stay to let the trust bring claims, whatever it chooses, in perpetuity. Both of those premises of this phantom provision are flawed. Let's start with just the big picture, though. Bankruptcy courts don't modify things, don't change the background rules in a visible link. There is nothing in this plan that either extends the automatic stay or modifies it. Judge Kayada, you asked him specifically which provisions. He said as to the first one, well, it's indirect or implicit in that only some claims were discharged. You stop there. Lots of claims are not discharged.  Securities fraud claims are not discharged. The whole point of a discharge is that the dischargeable claims are discharged and the clocks start ticking as to any claims that are not discharged. That's the way every bankruptcy works. This is no exception so that when we have an accepted set of claims, these particular HPE asbestos claims from the discharge, the clocks start ticking as to them. And we know that's right. That's not just me talking because of the four supplemental injunctions in Article 9. What do you say about Section 456 of the agreement, which says any liability for asbestos claims shall continue? The 456 has two purposes. One is to specify the entities that remain liable. It's only a subset of the original debtors, the HPE entities. And second is to make clear that it's only certain assets, the stock subscription agreement and the Hercules policy, that can be attached. Because one of the exceptions to the ordinary course clause is if the trust wins a judgment in the tort system, it can't go execute it on the ordinary course. It can't demand payment. It can't send the marshals out to attach property. It can't do a levy or execution. Rather, it simply gets an offset from the stock subscription agreement. 4.5.6, which is titled Limited Recourse to Assets of Reorganized HPEs, makes clear that the limited set of debtors and the limited recourse to assets. That's not anything like an automatic stay. The automatic stay, if this medallion on the ceiling is the automatic stay, it's a cage that comes crashing down and bars everybody from asserting any claim. What happens after the discharge, after the confirmation, after the effective date of this plan is that all claims are discharged except for this one subset against a subset of claims, against a subset of reorganized debtors, against a subset of their assets. But you lost me on the language I asked you about. Aren't you saying that the claims would not continue beyond 30 days? The liability for those asbestos claims terminated within 30 days. You may answer. Thank you, Your Honor. No, Your Honor. The liability as to those assets continues pursuant to the rest of Section 4.5, including the Ordinary Course Clause and the Anti-Defenses Clause. The trust, the bargain is that the trust could assert tort lawsuits, not that it was guaranteed to win those lawsuits. The whole point of preserving the policy was to inject the tort system, uniquely of any asbestos bankruptcy in history, this has never happened before, to inject the tort system in the ordinary course. And statute of limitations is a defense available in the ordinary course. And so all of 4.5 read together simply reiterates the bargain to use the tort system, which is exactly what Judge Saylor did here. If you applied Massachusetts law, the same as would be applied to any other litigant. That's the bargain the parties made. Thank you. Thank you, Your Honor. If you're truly caught by surprise by anything your opponent says, we'll give you another minute. Your Honor, thank you. Judge Kayotta asked the question, why didn't they, the trust, do that, extend the 362 stay explicitly? Let's remember, the trust didn't exist until after the plan went effective. This was TNN's plan. This is what TNN proposed. But the same question would apply to counsel for the claimants. Yes. And I think I answered it with respect to Judge Stahl's question earlier, which is when a new concept comes up, when lawyers develop a new procedure for handling a unique problem, they try to think of everything. They do the best they can. They don't always achieve perfection the first time. Obviously, if this problem ever came up again with a U.K. law-governed policy that couldn't be assigned. Except that that's certainly a true proposition. They don't always achieve perfection. But we need to have some hook in the language unless this is a reformation action. And the hook in the language you've pointed us to is 458F2. Yes. And I'm trying to get my mind around what the phrase, in the ordinary course to judgment or settlement means. I think what you're, the other side is arguing is that means back to the races with the ordinary rules. And you're saying kind of when you get around to it means in the ordinary course. Well, it's not quite when we get around to it. Your time value is shortened. Sure. But the opposite position is everything terminated in 30 days. This plan was structured to preserve claims against the insurance policy, not to cause them to lapse within 30 days. Mr. Perry said there's no excuse. They missed the deadline. Or, as we argue, there was no deadline to miss here. The deadline is the expiration of the Hercules policy. And that's when the deadline will occur. It's not an unlimited waiver. And it was TNN that waived it through these provisions of the plan. Why would TNN have agreed to the fact that it could be sued forever? Because this whole plan was structured to allow access to the Hercules policy. And the way to do that required that TNN stay on the hook for these claims, not be discharged. There is a difference between denial of discharge and a court saying, I'm not discharging these yet, I'm not denying discharge, they're going to be discharged at a later point. It doesn't make sense to require, if the statute of limitations stopped, the tolling stopped upon the discharge of the first claims in the case, the creditors whose claims would be discharged later or might be discharged later, they would have to bring their claims immediately under TNN's theory. The debtor would have to defend them, even though they might well be discharged later. That would be terribly wasteful and unfair. And that's why the system this plan sets up actually works the way we argue that it does. I have one question. On claims which arose after the discharge, I think you would agree that if there's a statute of limitations, that wouldn't run in the ordinary course. And thus if somebody has a, something comes up today, has a three-year statute, if you don't bring suit within that three years, you're out. Why is this any different? Well, I'm not sure I would acknowledge that, Your Honor. That is not this case, and we don't have to decide that here, because if I'm right about the cases that were pending, then it would also extend the statute for the cases that arise later. However, In perpetuity? Well, no, not in perpetuity. And as I said, a waiver is permissible, which TNN, the plan provides. Not in perpetuity, only to the policy expiry date, only for the purposes of accessing the policy. It's a difficult question, I acknowledge, but one that need not be answered in this case. He stressed the facts of this particular case, and that Mrs. Baraford certainly was aware of her claim and had asserted claims against other companies. And, in fact, had recovered. He said that your group, in essence, carried a running inventory of claims such as this. You knew they existed. You knew they couldn't be brought because of the stay in bankruptcy. And that here, there was, at least here, there was no reason you could not have acted within 30 days. When did your group, and I'll use that phrase because the trust didn't formally exist, how long have you known that Mrs. Baraford had this claim that she wanted asserted against whatever assets TNN had? Your Honor, I don't know the answer specifically as to Mrs. Baraford. All I can say more generally is that whatever claims existed, it required some organization, it required hiring lawyers, it required a process to get them brought under way. And he said you had all of that as part of negotiating out the plan. Conceptually, yes. But was there a list, a docket, here's the claims we're going to bring right away? That's not how the asbestos bar works, Your Honor. Yes, they have inventories of their cases in their offices, all the plaintiff's lawyers. Now the trust has to take over and say, okay, what claims can we bring? What ones are available? Where can we find the plaintiffs and so on? And then they have to file claims with the trust as well. So it's a long process, and we're talking with tens of thousands of claims to sort through and find the ones to bring. Not an easy process. Absolutely would have been preferable to bring them earlier, but not possible in any practical sense to bring any number of them within 30 days. So some of them you choose not to bring because you think they don't have any merit? There are a lot of reasons not to bring them. No merit or not very valuable claims or, you know, lawyers make judgments about what claims to bring and what not. You know, finding a law firm to take the case on a contingency and so on. A lot of issues. Okay. Thank you very much. Thank you. I apologize for the water. There's more paper towel. Our clerk will help you with that. Thank you. Mr. Perry, I trust you were not taken by surprise? You're correct. Thank you. Very well argued. Appreciate it.